IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEONA V. RHOADES, Executrix of the Estate
of DEWEY T. RHOADES, and widow in her
own right,

                Plaintiff,

    v.

ALLEN BRADLEY COMPANY, et al.,

                Defendants.

MDL 875

CIVIL ACTION
NO. 16-5844

**OPINION**

**Slomsky, J.**                                                 **July 16, 2024**

**TABLE OF CONTENTS**

I.     **INTRODUCTION** ........................................................................................... 3

II.    **BACKGROUND** ............................................................................................... 5

    **A. Decedent's Alleged Exposure to Asbestos-Containing Products** ........................... 5

    **B. Decedent's Death from Lung Cancer** ..................................................................11

III.   **STANDARD OF REVIEW** ......................................................................... 12

IV.   **ANALYSIS** ...................................................................................................... 13

    **A. Florida Law, Rather than Maritime Law, Applies to this Case** ........................... 15

        1. Maritime Law Does Not Apply ........................................................................ 15

          a. Locality Test ............................................................................................... 16

          b. Connection Test .......................................................................................... 17

             i. First Prong of the Connection Test ............................................................. 17

ii.  Second Prong of the Connection Test ........................................................ 18

2. Applicable Florida Law .......................................................................... 20

**B. Genuine Disputes of Material Fact Exist On Causation** ..................................... 21

1. Defendant Northrop Grumman Corporation ......................................... 22

a.  Causation .......................................................................................... 22

b.  The Florida Asbestos and Silica Act ......................................... 24

2. Defendant Raytheon Technologies Corporation ................................. 27

3. Defendant General Electric Company .................................................. 30

**C. Genuine Disputes of Material Fact Exist on the Government**

**Contractor Defense** ............................................................................................... 33

1. First Prong of the <u>Boyle</u> Test………………………………………………35

**D. Derivative Sovereign Immunity Defense** .................................................. 38

**E. Conspiracy and Punitive Damages Claims** .............................................. 39

**V.    CONCLUSION** .................................................................................................. 39

## I.      INTRODUCTION

Plaintiff Leona Rhoades ("Plaintiff" or "Mrs. Rhoades"), on behalf of the estate of her husband, Dewey T. Rhoades ("Decedent" or "Mr. Rhoades"), commenced this action against forty-three (43) Defendants who manufactured asbestos,[1] alleging that their products contained asbestos which contributed to her husband's lung cancer and eventual death.  (See Doc. No. 199

---

[1]   In The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?, the Honorable Eduardo C. Robreno describes the nature of asbestos and its harmful effects:

> Asbestos is a naturally occurring, fibrous mineral found in rock and soil. Asbestos can be found on or near the earth's surface, and it is extracted through typical mining practices. Asbestos fibers exist in the ambient air, in much of the world's drinking water, and in food and commercial products. Individuals are at risk of asbestos inhalation when the fibers become 'friable,' or damaged, and begin floating through the air in sufficient quantity. Asbestos fibers are released into the air only after being handled or otherwise disturbed, such as through mining or construction. Asbestos fibers do not pose any significant danger if they are properly sealed into commercial products; however, as those products become damaged or deteriorate over time, they release asbestos into the air. Aging and decay, building repairs, improper material removal, and improper encapsulation all cause asbestos fibers to become 'friable.' Although everyone is exposed to asbestos at some point, there is still controversy as to how much exposure is ordinarily required to affect a person's health. It is estimated that more than 27.5 million Americans had, by 1979, been exposed to the possible risk of inhaling asbestos fibers . . . Asbestos-related diseases are typically categorized into two groups: malignancies and non-malignancies. The most serious malignancy related to asbestos inhalation is mesothelioma, a rare, fatal cancer that affects the lining of the chest cavity or the peritoneum. Although mesothelioma is a rare form of cancer, the vast majority of mesothelioma diagnoses are associated with asbestos . . . Mesothelioma is regarded as the malignancy most closely correlated with asbestos exposure; however, lung cancer and various other cancers have also been linked to asbestos exposure and have formed the basis of asbestos litigation . . . The most common non-malignancy associated with asbestos exposure is asbestosis, a sometimes 'serious, progressive, long-term disease of the lungs,' caused by scarred lung tissue.  Whereas mesothelioma is always fatal, asbestosis can be fatal, but can alternatively occur without causing any symptoms or impairment.

Hon. Eduardo C. Robreno, The Federal Asbestos Product Liablity Multidistrict Litigation (Mdl-875): Black Hole or New Paradigm?, 23 Widener L.J. 97, 101-04 (2013).

¶ 4.)  Now, only three Defendants remain in this case: (1) General Electric Company ("GE"); (2) Raytheon Technologies Corporation ("RTC")[2]; and (3) Northrop Grumman Corporation ("NGC") (collectively, "Defendants").

On November 10, 2016, this case was removed from the Court of Common Pleas of Philadelphia County, Trial Division, to the United States District Court for the Eastern District of Pennsylvania.  (Doc. No. 1, Ex. 1.)  It became part of MDL-875.[3]

In her Third Amended Complaint, Plaintiff asserts the following claims: (1) negligence (Count I); (2) strict liability (Count II); (3) conspiracy to hide the hazards of asbestos pursuant to negligence and punitive damages claims (Count III); and breach of warranty (Count IV).[4]  (Doc. No. 199.)

Presently, there are three motions before the Court: (1) Defendant General Electric Company's Motion for Summary Judgment (Doc. No. 344); (2) Defendant Raytheon

---

[2]  At this case's inception, Raytheon Technologies Corporation ("RTC") was known as United Technologies Corporation.  Due to a merger between United Technologies Corporation and Raytheon Company, this new name was adopted.  (See Doc. No. 367.)  Accordingly, the Court will refer to United Technologies Corporation as Raytheon Technologies Corporation.  Pratt & Whitney, a division of RTC, will also be referenced throughout this Opinion.  (See Doc. No. 345 at 2.)

[3]  Multidistrict litigation is litigation comprised of multiple civil cases involving one or more common questions of fact, but the cases are pending in different judicial districts.  Such actions may be transferred to any single district for coordinated or consolidated pre-trial proceedings.  28 U.S.C. § 1407.  It is within the discretion of the United States Judicial Panel on Multidistrict Litigation, as authorized by 28 U.S.C. § 1407, to decide which district will receive the cases.  In 1991, the Judicial Panel on Multidistrict Litigation transferred all cases involving personal injury damages caused by asbestos products to the Eastern District of Pennsylvania in what is now known as MDL-875.  See In re Asbestos Prod. Liab. Litig (No. VI), 771 F. Supp. 415 (J.P.M.L. 1991).

[4]  Plaintiff's Third Amended Complaint also included a Count V titled, "Employer Defendant's Tortious Conduct."  (Doc. No. 385.)  This claim was only asserted against Defendant Erie Forge and Steel, which has been dismissed from this case.  (See id.)

Technologies Corporation's Motion for Summary Judgment (Doc. No. 345); and (3) Defendant Northrop Grumman Corporation's Motion for Summary Judgment (Doc. No. 352).

In June 2020, Plaintiff filed Responses in Opposition to each Motion.  (Doc. Nos. 363, 364, 365.)  On July 8, 2020, Defendants Raytheon Technologies Corporation and General Electric Company filed Replies.  (Doc. Nos. 373, 374.)  On July 17, 2020, Defendant Northrop Grumman Corporation filed a Reply.  (Doc. No. 376.)  The three Motions are now ripe for disposition.  For reasons discussed <u>infra</u>, Defendant General Electric Company's Motion for Summary Judgment (Doc. No. 344), Defendant Raytheon Technologies Corporation's Motion for Summary Judgment (Doc. No. 345), and Defendant Northrop Grumman Corporation's Motion for Summary Judgment (Doc. No. 352) will be denied.

## II.    BACKGROUND

### A.    Decedent's Alleged Exposure to Asbestos-Containing Products

Dewey T. Rhoades, the decedent (the "Decedent"), passed away before this lawsuit was filed, so his deposition was never taken.  Accordingly, the evidence related to his military service, where he was exposed to asbestos, primarily stems from the depositions of three former Naval officers: (1) Rex Spratlin ("Spratlin"); (2) Harold Rhodes ("Rhodes"); and (3) Leonard Mosley ("Mosley").[5]  Their depositions will be discussed, <u>infra</u>.

During his life, Mr. Rhoades held many positions involving mechanical repair work.  (Doc. No. 199 ¶ 8(a)-(e).)  Specifically, he worked at the following companies and governmental agencies: (1) Erie Forge and Steel; (2) the United States Navy; (3) Odeco; and (4) Pensacola

---

[5]  A fourth Naval officer, Ronald Richards, was also deposed.  Ronald Richards testified that he did not remember working with Decedent in the Navy and could not provide any testimony regarding the type of work Decedent performed on aircrafts.  (Doc. No. 364-10.)  Because his testimony is not relevant to the resolution of Defendants' Motions for Summary Judgment, it will not be discussed.

Aviation Center. (Id.)  He also engaged in repair work on his own automobiles. (Id. ¶ 8(e).)  Of particular importance in this case is Mr. Rhoades's work in the Navy, where he served "as an Air Force power plant mechanic primarily on engine repair." (Id. ¶ 8(b).)

Given the Complaint's focus on Mr. Rhoades' time in the Navy, a chronology of his Naval service, along with the relevant aircraft and engines on which he worked, will be discussed.[6]

Mr. Rhoades began his service at Cecil Field, a land base in Jacksonville, Florida. (Id. ¶ 8(b)(1).)  While there, he was a member of squadron VA-105.  As a member of this unit, Mr. Rhoades served aboard the USS Kitty Hawk and the USS Saratoga. (Id.)  He served on the USS Kitty Hawk with Rex Spratlin and Harold Rhodes, mostly repairing engines on aircrafts. (Doc. No. 363-6 at 7.)  Spratlin saw him on the vessel and testified that aircrafts known as A-4's, A-5's, A-6's, and A-7A's were serviced on the Kitty Hawk flight deck. (See id. at 13-17.)  Northrop Grumman Corporation ("NGC") is a manufacturer of the A-7A aircraft. (See id.)  The A-7A typically contained an engine known as the TF-30, manufactured by Pratt & Whitney, a subdivision of Raytheon Technologies Corporation ("RTC"). (Id.)  The A-4 aircraft was built by NGC. (Doc. No. 363-6 at 12.)  The A-6 airplanes also were produced by NGC. (Id.)  A-6s contained "Pratt and Whitney J-52-P8-B engines." (Id.)  Both the A-6 and A-7 aircraft had engines manufactured by Pratt & Whitney containing asbestos components. (Id. at 1-9.)

Both Spratlin and Rhodes testified about the work Decedent carried out on vessels such as the USS Kitty Hawk and the USS Saratoga.  For example, Rhodes testified about engine repair on the vessels:

> Rhodes:        [W]e removed the engines.  That was probably the biggest job we
>                did. We would remove them from the airframe and then work on

---

[6]  Rhoades repaired aircrafts at different locations.  However, only his work on the aircrafts and engines of the three remaining Defendants is relevant here.

the engines to a certain point.  And we did certain checks along the way . . .

Q:          What type of aircraft were assigned to VA-105 while you were on the Kitty Hawk?

Rhodes:     A-7A

* * *

Q:          Are you able to tell me how many times you worked with Dewy Rhoades during your time on the Kitty Hawk?

* * *

Rhodes:     I'd say it was—it was several times a week.

* * *

Q:          What were your work hours on the Kitty Hawk?

Rhodes:     We worked 12-hour shifts.

* * *

Q:          Do you remember the manufacturer of the engines that you were removing from the A-7A's?

Rhodes:     Uh-huh. Yes, sir.

Q:          What was it?

Rhodes:     Pratt & Whitney.[7]

Q:          Do you remember the model?

Rhodes:     Hmm. I had that one and its gotten away from me.

Q:          Okay. When you—you talked about breaking down the engine to a certain point. Can you go into some more detail about what that entailed?

Rhodes:     That was—you—the combustion chamber area, we took the covers off of them, removed the cans out of it, and they were inspected.

---

[7]  At this time, Pratt & Whitney was a predecessor of Defendant RTC.

> And then you inspected the—what the cans were attached to, that part of the engine, for cracks. That was the big thing, was making sure there were no cracks in that area, because if there were cracks, then it would have to go to another intermediate maintenance level.

(Doc. No. 364-2 at 9-10, 29.)  Spratlin testified that he personally saw Decedent on the USS Kitty Hawk while completing his service.  Spratlin noted that while serving on the USS Kitty Hawk, A-6 aircraft were also on board.  (See Doc. No. 363-6 at 13-17.)  Spratlin carried out engine repairs on A-6 aircraft which were manufactured by Defendant NGC.  (See id.) ("A-6 squadron was on there . . . there'd by A'6's up there . . .").

After working on these aircraft carriers, Mr. Rhoades became a member in 1972 of Reconnaissance Attack Squadron 6 ("RVAH-6").  (Id. at (b)(4).)  While his service began in Albany, Georgia, his unit later moved to Key West, Florida.  (Id.)  As a member of this squadron, Mr. Rhoades also served aboard the USS Forrestal and the USS America.  (Id.)  While working aboard the USS Forrestal, he was supervised by Leonard Mosley ("Mosley").  (See Doc. No. 365-10.)  Mosley testified that he knew Decedent personally during this time, and that he and Decedent "did all the same jobs . . . as far as disassembling the engines and removing them." (Id. at 4-5.)  During their time in the RVAH6, Decedent and Mosley worked on on RA5C aircraft with J-79 engines manufactured by Defendant GE.  (See id. at 4, 44.)  In his deposition, Mosley describes in detail the work that he and Decedent performed during this time on asbestos-containing engines such as the J-79 as follows:

| Q: | Okay. You mentioned clamps. |
|---|---|
| Mosley: | Yes. Have a -- have a -- have a gray material, right? |
| Q: | Yes. |

Mosley:     and a tremendous amount of vibration. That's the -- the edges of the clamp was starting to start breaking down. It's like fibrous clamp.

Q.          Okay.

Mosley:     And you see it's at the fringe -- like a fringe on the end of clamp. Now, the clamp itself, you see where -- where the metal clamp that the -- the metal --the metal part of the clamp because you see the depression in there. And then after you get the clamp -- the --the -- the asbestos part of the -- it was asbestos material. And you could actually slide -- slide that *off,* the clamp. And sometimes you had to slide those --slide -- slide that -- you have to clamp that worn part, wor[n] part to it. You have to slide -- slide that *off* and then push that back on -- back on a new metal – metal band in order -- in order to use -- reuse the band --reutilize the clamp, the clamp. You have a clamp -- say if you had a size -- it was a size 6 or size 4 clamp and all you had was 6, you would have to take the -- cut the number 6 clamp coating covering -- take that *off* and slide it around the number 4 or number 5 clamp metal band . . .

                              * * *

Q:          When you handled—when you and [Decedent] handled . . . this coating—this---this cloth material I think you described it, what happened? What did you see?

Mosley:     I guess that—that—the coating usually breaks down after a while due to . . . the vibration.

Q:          Right. And when—

Mosley:     It breaks down.

Q:          And when it breaks down, what happens?

Mosley:     It's—it's like—like fiber. You saw like—like it like it kind of fray around the edges. And—and you can see the rubbing on it. The rubbing on it is just darker where it's been rubbed, like dark area.

                              * * *

Q:          How close were you and [Decedent] to this fibrous material?

9

| | |
|---|---|
| Mosley: | Well, you have it right in your hand, it's just small. The clamp is . . . not like huge. It's a small clamp . . . you're right there with your face to the clamp in other words. |
| Q: | All right. You—you did this job? |
| Mosley: | I did this job for years, yes. |
| Q: | What about [Decedent]? Did [he] do this job? |
| Mosley: | [He] did it. I did it. Other people in our unit did it. |

(Id. at 40-42.)  In addition to this work, Mosley and Decedent worked on "dropping engines" which entailed rolling a cart underneath an engine, jacking it down, and rolling it back to the engine shop for repair.  (See id. at 15.)  Specifically, Mosley testified that Decedent, as a "smaller guy," squeezed in between the engine and firewall while working on aircraft engines.  (Id.)

Next, during a two-year period in 1980 to 1982, Decedent was a member of Fitron 32 in Virginia.  (Id. at (b)(8).)  This unit used F14 A Tomcats, built by NGC, with Pratt & Whitney TF-30 engines.  (Id.)  The F14 As were replaced with F14 Bs "which contained asbestos."  (Id.)  Then, Decedent also was assigned to VF-101 in Virginia, where he worked on McDonnell Douglas and NGC aircraft that contained Pratt & Whitney and GE engines.  (Id. at (b)(6).)

Decedent next served in VT-10, a unit based in Pensacola, Florida.  (Id. at (b)(9).)  There, he worked on T2B airplanes, which had Pratt & Whitney J60-P-6 turbojets.  (Id.)  He also worked on T39 Sabreliners and T-34Cs. (Id.)  The T39 Sabreliners and T-34Cs contained Pratt & Whitney engines.  (Id.)

This chronology completes Decedent's work history and exposure to asbestos-laden products.  In sum, Plaintiff alleges that Decedent's work as an engine repair mechanic exposed Mr. Rhoades to asbestos and caused his lung cancer and eventual death.  (Id. ¶¶ 8(b)(1)-(2), (4)-(6), (9); 10-13.)

### B.      Decedent's Death from Lung Cancer

On October 23, 2014, Mr. Rhoades was diagnosed with lung cancer.  (Id. ¶ 4.)  During his life, he smoked 1 ½ packs of cigarettes per day.  (Id. ¶ 7.)  His doctors informed him that the cancer was caused by "asbestos exposure and inhalation and smoking."  (Id. ¶ 4.)  Mr. Rhoades passed away on April 2, 2016.  (Id.)

As noted previously, Plaintiff brings this action against various Defendants.  The allegations pertaining to each of the three remaining Defendants are as follows:

### 1.  Defendant Northrop Grumman Corporation

Northrop Grumman is responsible for injuries caused by asbestos which it supplied or caused by its design of equipment including but not limited to equipment on F-14 Tomcat Airplanes as set out above to contain asbestos. Grumman employees supervised the repair of its air planes. It is believed and therefore averred that Grumman or Vought is responsible for injuries caused by Ling Temco Vought A-7 Corsairs and other equipment.  Grumman and Vought employees supervised installation and repair of the asbestos containing products and supplied asbestos-containing replacement parts.

### 2.  Defendant Raytheon Technologies Corporation

At all times material Pratt and Whitney sold aircraft engines and steam power equipment designed and/or intended to contain asbestos products but not limited to such as adhesives grommets clamp and asbestos gaskets and packing.  Exposure to asbestos on these engines caused the injuries complained of herein.  These included but are not limited to Pratt and Whitney J052, TF-30, JT10A, J-60-P-6, TT 12A-8 and Pratt Whitney Canada PT 6A-25.  These engines were designed to contain asbestos and Pratt and Whitney supervised installation and repairs of these engines.  Exposure to asbestos dust in these operations caused the injuries at issue herein.  Pratt and Whitney Canada is a mere creature and alter ego of Pratt and Whitney through its parent United Technologies.  Pratt and Whitney employees supervised installation and repair of its equipment on airplanes and sold replacement asbestos for its equipment.

### 3.  Defendant General Electric Company

GE sold asbestos-containing electrical products and engines which released asbestos fibers inhaled by Decedent and which caused his injuries.  In addition[,] GE sold replacement asbestos parts and supervised the replacement

of asbestos-containing products on air planes.  In addition[,] Decedent had to repair GE J-79 engines on RA-5C air planes, and T2E air planes and on other planes such as Phantoms and Tomcats.  Exposure to asbestos on the GE J-79 and other GE engines and electrical parts caused the injuries at issue herein.  GE supervised installation and removal of these products.

(Id. ¶ 9(t), (ag), (ak)-(al).)

## III.   STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 F. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176,

181 (3d Cir. 2009)).  The court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  <u>Anderson</u>, 477 U.S. at 247–249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the court must credit the nonmoving party's evidence over that presented by the moving party.  <u>Id.</u> at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  <u>Id.</u> at 250.

## IV.    ANALYSIS

In their respective Motions for Summary Judgment, Defendants make substantially similar arguments.  First, each asserts that it is entitled to summary judgment because Plaintiff is unable to establish causation, that is, its products, although laden with asbestos, were the cause of his lung cancer.  (<u>See</u> Doc. Nos. 344 at 13; 345 at 14-17; 352 at 11-18.)  Second, each argues that summary judgment is appropriate because the government contractor defense bars Plaintiff's claims.  (<u>See</u> Doc. Nos. 344 at 23-30; 345 at 18-24; 352 at 21-26.)   Two Defendants (RTC and NGC) argue that Plaintiff's claims are precluded because of derivative sovereign immunity.  (<u>See</u> Doc. Nos. 345 at 24-25; 352 at 29-31.)  The government contractor defense and derivative sovereign immunity are described in more detail <u>infra</u>.

Defendants differ, however, as to what law should be applied: maritime law or Florida law.  GE argues that maritime law governs (Doc. No. 344 at 9-11); RTC and NGC propose that Florida law governs.  (Doc. Nos. 345 at 12-14; 352 at 8-11.)

In addition, some Defendants make arguments that other Defendants do not.  For example, GE argues that Plaintiff "has no admissible evidence establishing that GE owed a duty to warn [about the presence of asbestos] under the U.S. Supreme Court <u>DeVries</u> standard."  (Doc. No.

13

344 at 14-23.)  Finally, NGC asserts two additional defenses: (1) the bare metal defense bars Plaintiff's claims and (2) in the alternative, partial summary judgment should be granted on Plaintiff's conspiracy and punitive damages claims because Plaintiff has failed to produce evidence in support of those claims.  (Doc. No. 352 at 18, 31-33.)

In response, Plaintiff argues that summary judgment is inappropriate as to all Defendants. (See Doc. Nos. 364, 365, 363.)  First, Plaintiff argues that maritime law should apply.[8]  (See Doc. Nos. 364 at 13; 365 at 14; 363 at 12.)  Second, Plaintiff asserts that she has demonstrated through testimony of witnesses and experts that Decedent was exposed to or worked with the asbestos related products of Defendants.  (See Doc. Nos. 364 at 14-17; 365 at 14-16; 363 at 18-20.) Third, Plaintiff submits that the government contractor immunity does not protect Defendants because this issue is a question for the jury.  (See Doc. Nos. 364 at 17-18; 365 at 17; and 363 at 23-25.)  Fourth, Plaintiff asserts that derivative sovereign immunity is not a defense when Defendant allegedly admits that it did not follow the federal requirements to warn Decedent of the dangers of asbestos.  (See Doc. Nos. 364 at 19-20; 363 at 25-26.)  Fifth, Plaintiff argues that the test under DeVries has been met.  (See Doc. No. 365 at 15-17.)  Finally, regarding Defendant NGC's arguments, Plaintiff asserts that the bare metal defense is not viable in the instant case, and that punitive damages are permitted under both maritime law and Florida law.  (See Doc. No. 363 at 21-22, 26.)

Each argument will be addressed in turn.

---

[8] Plaintiff agrees, however, that Florida law may apply to the land-based exposures to asbestos alleged to have occurred at Cecil Field and in Key West.  (See, e.g., Doc. Nos. 363 at 12; 365 at 14.)

**A.  Florida Law, Rather than Maritime Law, Applies to this Case**

At the outset, the Court must decide which law to apply: maritime or Florida law.  As noted above, Defendants and Plaintiff present differing interpretations as to which law should govern the Motions for Summary Judgment.   Defendant GE argues that maritime law governs, Defendants RTC and NGC argue that Florida law governs, and Plaintiff argues in favor of maritime law.

### 1.   Maritime Law Does Not Apply

Under the United States Constitution, a federal court has the power to preside over "all [c]ases of admiralty and maritime [j]urisdiction."  U.S. CONST. ART. III, § 2.  28 U.S.C. § 1333 codifies this power by stating "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, over: (1) [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."  28 U.S.C. § 1333(1).

"[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity."  Conner v. Alfa Laval, Inc., 799 F. Supp. 2d 455, 463 (citing Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995)).  The first condition, known as the locality test, "requires that the tort occur on navigable waters or, for injuries suffered on land, that the injury be caused by a vessel on navigable waters."  Id.  "[W]ork performed aboard a ship that is docked at the shipyard is sea-based work, performed on navigable waters, but "work performed in other areas of the shipyard or on a dock, . . . is land-based work."  Deuber v. Asbestos Corp. Ltd., MDL No. 875, 2011 WL 6415339, at *1 n.1 (E.D. Pa. Dec. 2, 2011) (citations omitted).  The second condition, known as the connection test, is comprised of two elements: (1) "whether the incident has 'a potentially disruptive impact on maritime commerce'"

and (2) "whether 'the general character' or 'the activity giving rise to the incident' shows a 'substantial relationship to maritime activity.'" Id.  As to this latter element, a court looks to "whether a tortfeasor's activity . . . is so closely related to activity traditionally subject to admiralty law that the reasons for applying specialty admiralty rules would apply in the suit at hand." Id.

        a. Locality Test

First, for maritime law to apply, the locality test must be met.  See Jerome B. Grubart, Inc., 513 U.S. at 532.  As noted in Conner, "navy workers . . . frequently split at least some portion of their time between ships on navigable waters and land."  799 F. Supp. 2d at 466.  Furthermore, asbestos cases are unique because the "disease has a long latency period and plaintiffs often rely on expert testimony that all non-trivial exposures to asbestos contribute to the disease process." Id. (citation omitted).  Given these considerations, "in the case of asbestos-related disease arising from work on or around ships . . . the locality test is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters."  Id.

Defendant GE argues that the location test is met, for "all or at least a portion of [Decedent's] alleged asbestos exposure occurred aboard U.S. Navy ships . . ."  (Doc. No. 344 at 10.)  The Court agrees.  While true that a significant portion of Decedent's work occurred at land bases, rather than on navigable waters, his work also extended to service on navigable waters.  As stated in Conner, the locality test merely requires that "some portion of the asbestos exposure occurred on a vessel on navigable waters."  Conner, 799 F. Supp. 2d at 466 (emphasis added).  Plaintiff alleges that Decedent was exposed to asbestos while serving aboard the USS Kitty Hawk, USS Saratoga, USS Forrestal, and USS America.  All these vessels were involved in extended

voyages at sea, including to Vietnam, the West Pacific, and the Mediterranean Sea.  Accordingly, the locality test is satisfied.

               b.   Connection Test

For maritime law to apply, both prongs of the connection test must be met.  Again, the two prongs of the connection test are: (1) "whether the incident has 'a potentially disruptive impact on maritime commerce'" and (2) "whether 'the general character' or 'the activity giving rise to the incident' shows a 'substantial relationship to maritime activity.'"  Deuber, MDL No. 875, 2011 WL 6415339, at *1 n.1 (citations omitted).

               i.   First Prong of the Connection Test

This first prong requires the Court "to determine whether the asbestos exposure Plaintiffs allege had a potentially disruptive impact on maritime commerce when characterizing the incidents generally."  Conner, 799 F. Supp. 2d at 467 (citing Jerome B. Grubart, Inc., 513 U.S. at 534).  In Conner, the court concluded that this prong was met because the plaintiffs

> served aboard Navy vessels that routinely sailed and docked on navigable waters. They were effectively sailors, whose job it was to maintain equipment that was integral to the functioning of the ships on which they served.  Under such circumstances, exposure to defective products could 'potentially slow or frustrate work being done on the vessel.'

Id. (citations omitted).  Additionally, the court explained that exposure and subsequent illness can decrease available workers and incite fear of exposure, both of which can "disrupt the Navy's ability to protect other commercial ships at sea if called upon to do so."  Id. at 467-68 (citations omitted).

Here, Mr. Rhoades was allegedly exposed to asbestos while aboard Naval ships sailing through navigable waters, as were the sailors in Conner.  Mr. Rhoades' position required him to repair aircraft employed by the Navy in its defense.  This work was not directly tied to the

operation of the vessel itself, namely the ship's ability to proceed through water, but if the aircraft were not functional as a result of sailors falling ill, it would certainly "disrupt the Navy's ability to protect other commercial ships at sea if called upon to do so" or otherwise inhibit the Navy's ability to fight in times of war.  Accordingly, the first prong of the connection test is met.

ii.      Second Prong of the Connection Test

The second prong of the connection test requires a court to consider "whether 'the general character' or 'the activity giving rise to the incident' shows a 'substantial relationship to maritime activity.'"  Deuber, MDL No. 875, 2011 WL 6415339, at *1 n.1 (citations omitted).  Here, as in Conner, the relevant activity is "the manufacture of products for use on vessels."  Conner, 799 F. Supp. 2d at 468.  But the Court must answer the more difficult question of what constitutes a "substantial relationship to maritime activity."

In Conner, the court discusses a case from the Supreme Court of Virginia: John Crane, Inc. v. Jones, 650 S.E.2d 851, 465 (Va. 2007).  In John Crane, Inc., the plaintiff was exposed to asbestos-containing products manufactured by defendant.  Id. at 465.  The defendant had "marketed gaskets and packing material directly for the marine industry and advertised its products for 'marine engine and general ship use.'"  Id.  It "also advertised its products in publications about maritime activity."  Id.  The court concluded that this was sufficient to constitute a substantial relationship to traditional maritime activities.  Id.  Likewise, in Conner, the court held that a manufacturer's production of defective products also satisfied the substantial relationship test because the products it created, "turbines, pumps, purifiers, generators, boilers, valves, gaskets, packing, and steam traps – were essential for the proper functioning of ships and made for that purpose."  Id. at 469.

18

Defendants RTC and NGC argue that Plaintiff is unable to prove that their products were substantially related to a maritime activity.  In particular, RTC argues that their engines "were not essential to the proper functioning of the Navy ships and were not made for that purpose.  Rather, the engines were made solely for use on military aircraft."  (Doc. No. 345 at 13.)  NGC makes an identical argument: that their aircraft "were not integral to the operation of vessels on which Decedent served such to satisfy this inquiry.  The aircraft on which Decedent performed repairs were not related to the operation of the ships, let alone integral thereto."  (Doc. No. 352 at 11.) The Court agrees.

Here, based on the evidentiary record, Defendants contracted with the government, including the Navy, to produce engines and aircraft.  However, the products, namely the aircraft engines, were created for the proper functioning of the aircraft employed by the Navy in times of war. Unlike in Conner where the products were directly tied to the functioning of the sea vessel, Defendants' products—aircraft engines—were not integral the vessel's operation and functioning.  Further, Defendants did not manufacture products "essential for the proper functioning of ships and made for that purpose."  Put simply, in this instance, aircraft engines were created for the proper functioning of aircraft, not sea vessels.  And as the United States Supreme Court noted in Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, when discussing what constitutes a "significant relationship to traditional maritime activity,"

> The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters . . . Rules and concepts such as these are wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical boundaries and exempt from the navigational rules of the maritime road. The matters with which admiralty is basically concerned have no conceivable bearing on the operation of aircraft, whether over land or water.

409 U.S. 249, 269-70 (1972); see also Cochran v. E.I. duPont de Nemours, 933 F.2d 1533, 1535

(11th Cir. 1991) (holding that maritime law did not extend to Navy sailor's personal injury

claims resulting from asbestos exposure while repairing nonskid floor of aircraft storage on

aircraft carrier).  The mere fact that the aircrafts at issue were resting on sea vessels does not

transform a case concerning asbestos in aircraft engines to a case sounding in admiralty law.

Accordingly, the second prong of the connection test is not met.

Because both parts of the test under Jerome B. Grubart, Inc., supra, are not met, maritime law

does not apply in this case.[9]  Furthermore, because Defendants RTC and NCG have agreed that

Florida substantive law applies, this Court will apply Florida law in deciding the Motions for

Summary Judgment.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); see also Guaranty

Trust Co. v. York, 326 U.S. 99, 108 (1945).

### 2.   Applicable Florida Law

The parties remaining in this case agree that if maritime law does not apply, then Florida

substantive law applies, especially to the issue of causation.  In this regard, courts in this District

have previously addressed product identification and causation under Florida law.  See Lyautey

v. Alfa Laval, Inc., No. 10-22891, 2012 WL 2877389, at *1, n. 1 (E.D. Pa. Mar. 21, 2012).  In

Lyautey, the court noted as follows:

> The Florida Supreme Court has not articulated a standard of causation necessary
> to survive summary judgment in asbestos cases, and lower Florida courts have
> rejected the 'frequency, regularity, and proximity' test, which has been adopted in
> many courts throughout the nation. As clarified by this Court in Faddish v.
> General Electric Co., to bring a claim under Florida law, a plaintiff must simply
> show that a defendant's product was a 'substantial contributing factor' to the
> injury that occurred. No. 09–70626, 2010 WL 4146108, at *3–4 (E.D. Pa. Oct. 20,

---

[9]  As a result, any of Defendants' arguments relying on Air and Liquid System Corp. v. Devries
or asserting the bare metal defense are inapplicable.  See Air & Liquid Sys. Corp. v. DeVries,
586 U.S. 446, 991 (2019) (addressing a product manufacturer's duty to warn in the context of
maritime law).

2010) (citing Asbestos and Silica Compensation Fairness Act, Fla. Stat. § 774.205).  If a defendant's products are identified in a given case, 'traditional' methods of finding causation apply.  <u>Celotex Corp. v. Copeland</u>, 471 So. 2d 533, 536 (Fla. 1985).  The traditional method of establishing causation in negligence (e.g., failure to warn) cases requires the plaintiff to 'introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result.' <u>Gooding v. University Hospital Bldg., Inc.,</u> 445 So. 2d 1015 (Fl. 1984) (quoting Prosser, Law of Torts § 41 (4th Ed. 1971)). . . . In summary, the Court of Appeals of Florida has liberally applied the substantial contributing factor test allowing plaintiff to survive summary judgment based on strong circumstantial evidence of exposure through[] co-worker testimony[] but has not permitted plaintiff to survive a directed verdict with evidence requiring many inferences as to causation.

<u>Id.</u>  The court in <u>Lyautey</u> also described the standard under Florida law for strict liability claims:

A strict liability claim brought under Florida law also requires a plaintiff to establish, <u>inter</u> <u>alia</u>, the existence of a proximate causal connection between the injury at issue and the defect or unreasonably dangerous condition of the product at issue.  <u>See</u> <u>Edward M. Chadbourne, Inc. v. Vaughn</u>, 491 So. 2d 551, 553 (Fla. 1986); <u>Bailey v. Janssen Pharmaceutica, Inc.</u>, 288 F. App'x 597, 605 (11th Cir. 2008) (applying Florida law).  In <u>West v. Caterpillar Tractor Co., Inc.</u>, the Supreme Court of Florida ruled that, "[i]n order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages."  336 So. 2d 80, 87 (Fla. 1976).

<u>Id.</u>

## B. Genuine Disputes of Material Fact Exist On Causation

As previously noted, the remaining three Defendants move for summary judgment, arguing that Plaintiff has brought forth no evidence from which a reasonable jury could conclude that the products made by Defendants were a substantial factor in causing his lung cancer.  (<u>See</u> Doc. Nos. 345-2 at 17; 344 at 15; 352 at 15.)  Defendants' arguments regarding causation will be discussed <u>seriatim</u>.

        1.  Defendant Northrop Grumman Corporation

Defendant NGC moves for summary judgment, arguing that no genuine dispute of material fact exists on causation, and that Plaintiff has failed to set forth sufficient facts to establish that Defendant's products were a substantial contributing factor to Decedent's cancer.  (See Doc. No. 352 at 13-16.)

        a.  Causation

Defendant NGC asserts that "Plaintiff does not have evidence sufficient to establish that Decedent worked with or around any asbestos-containing product attributable to [Defendant NGC], much less that his work on or around any such product resulted in exposure to respirable asbestos fibers sufficient to cause his lung cancer."  (Doc. No. 352 at 13.)   In particular, Defendant NGC argues that

> there is no evidence that Decedent worked with an A-7A aircraft component that contained asbestos.  The only witness to testify that he observed Decedent working with engines on the A-7A aircraft, Harold Rhodes, could only identify limited handling of the components associated with those engines and he never described circumstances where they manipulated the components in a way that would create dust; he never testified that he saw dust emanating from such components . . .  and he never testified that he observed Decedent breathing any dust when he was working with or around such components.

(Doc. No. 352 at 15.)

In response, Plaintiff submits that Decedent was exposed for years to products containing asbestos manufactured by NGC.  (See Doc. No. 363 at 8-10.)  As set forth above, Plaintiff relies on the deposition testimony of Harold Rhodes, a co-worker of Decedent while he was stationed on the USS Kitty Hawk.  In his deposition, Rhodes testified that he personally knew Decedent during his military service, and he worked closely with Decedent during lengthy shifts several times a week on the USS Kitty Hawk, during which time he removed asbestos-containing engine

from A-7 aircraft.  (Doc. No. 364-2 at 5-29.)  For example, Rhodes testified that he repaired engines on the vessels, during his time with VA-105:

> Rhodes:  [W]e removed the engines.  That was probably the biggest job we did. We would remove them from the airframe and then work on the engines to a certain point.  And we did certain checks along the way . . .
>
> Q:  What type of aircraft were assigned to VA-105 while you were on the Kitty Hawk?
>
> Rhodes:  A-7A
>
>                       \* \* \*
>
> Q:  Are you able to tell me how many times you worked with Dewy Rhoades during your time on the Kitty Hawk?
>
>                       \* \* \*
>
> Rhodes:  I'd say it was—it was several times a week.
>
>                       \* \* \*
>
> Q:  What were your work hours on the Kitty Hawk?
>
> Rhodes:  We worked 12-hour shifts.

(Doc. No. 364-2 at 9-10.)

Additionally, while Defendant focuses its argument on A-7 aircraft, Plaintiff proffered evidence showing that asbestos products also were present on A-6 aircraft, which were manufactured by NGC and are at issue in Plaintiff's Response in Opposition.  (See Doc. Nos. 363-3 at 8; 363-6 at 12.)  In support of this argument, Plaintiff relies on the deposition testimony of Rex Spratlin, who personally saw Decedent on the USS Kitty Hawk while also working on the vessel.  When asked whether A-7 aircraft were the only aircraft he encountered during the Kitty Hawk cruise, Spratlin answered in the negative, noting that in addition to A-7 aircraft, A-4 and

A-6 aircraft were present, all manufactured by NGC.  (Doc. No. 363-6 at 13-17) ("There'd be A-4's up [on the Kitty Hawk Cruise], there'd be A-6's up there, A-5's up there . . .").

Thus, Plaintiff has identified sufficient evidence from which a reasonable jury could conclude that Decedent was exposed to asbestos as a result of his extensive work on and around A-6 and A-7 aircraft engines during his time on the USS Kitty Hawk, and that it was a substantial contributing factor in causing his injury.  Because Plaintiff has raised questions of fact regarding causation, summary judgment will not be granted as to Defendant NGC.

### b.   The Florida Asbestos and Silica Act

Defendant NGC also raises the argument that the Florida Asbestos and Silica Compensation Fairness Act precludes Plaintiff's claims.  (See Doc. No 352 at 16.)  Defendant asserts that under this act (the "Florida Act"), which has a heightened pleading requirement, Defendant has failed to make a threshold showing of causation.  (See id.)  Here, however, Plaintiff has raised a genuine dispute of material fact on causation, as discussed infra.  Moreover, Defendant's argument about the heightened pleading requirement of Florida law is not on point because this case is already at the summary judgment stage.  For clarity's sake, however, the Court will address why the Florida Act does not bar Plaintiff's claims.

Under the Florida Act, a smoker plaintiff must make a showing of each of the following six prerequisites to proceed with a lawsuit alleging that asbestos exposure caused that plaintiff's lung cancer:

(a)   A diagnosis by a qualified physician who is board certified in pathology, pulmonary medicine, or oncology, as appropriate for the type of cancer claimed, of a primary cancer of the lung, larynx, pharynx, or esophagus, and that exposure to asbestos was a substantial contributing factor to the condition.

(b)   Evidence sufficient to demonstrate that at least 10 years have elapsed between the date of first exposure to asbestos and the date of diagnosis of the cancer.

24

    (c)   Radiological or pathological evidence of asbestosis or diffuse pleural thickening or a qualified physician's diagnosis of asbestosis based on a chest X ray graded by a certified B-reader as at least $^1/_0$ on the ILO scale and high-resolution computed tomography supporting the diagnosis of asbestosis to a reasonable degree of medical certainty.

    (d)   Evidence of the exposed person's substantial occupational exposure to asbestos. If a plaintiff files a civil action alleging an asbestos-related claim based on cancer of the lung, larynx, pharynx, or esophagus, and that plaintiff alleges that his or her exposure to asbestos was the result of extended contact with another exposed person who, if the civil action had been filed by the other exposed person, would have met the substantial occupational exposure requirement of this subsection, and the plaintiff alleges that he or she had extended contact with the exposed person during the time period in which that exposed person met the substantial occupational exposure requirement of this subsection, the plaintiff has satisfied the requirements of this paragraph. The plaintiff in such a civil action must individually satisfy the requirements of this subsection.

    (e)   If the exposed person is deceased, the qualified physician, or someone working under the direct supervision and control of a qualified physician, may obtain the evidence required in paragraphs (b) and (d) from the person most knowledgeable about the alleged exposures that form the basis of the asbestos claim.

    (f)   A conclusion by a qualified physician that the exposed person's medical findings and impairment were not more probably the result of causes other than the asbestos exposure revealed by the exposed person's employment and medical history. A conclusion that the medical findings and impairment are "consistent with" or "compatible with" exposure to asbestos does not meet the requirements of this subsection.

F.S.A. § 774.204(3).

Here, Defendants removed this case from state court pursuant to the federal officer removal statute: 28 U.S.C. § 1442. (Doc. No. 1 at 6.) Cases removed based on 28 U.S.C. § 1442 apply state substantive law and federal procedural law. See Dugas v. 3M Co., 101 F. Supp. 3d 1246, 1250 (M.D. Fla. 2015); see also Kolibash v. Comm. on Legal Ethics of W. Virginia Bar, 872 F.2d 571, 576-77 (4th Cir. 1989) ("The federal officer removal statute permits a state action to be adjudicated on the merits in federal court . . . and a federal officer is therefore guaranteed a

federal forum in which federal rules of procedure will be applied.") (quoting <u>Arizona v. Manypenny</u>, 451 U.S. 232, 241-42 (1981)).

In <u>Dugas</u>, the court articulated the two-part test set forth in <u>Hanna v. Plumer</u>, 380 U.S. 460 (1965) for determining whether a law is substantive or procedural in the context of the Florida Act.  The court in <u>Dugas</u> stated:

> To aid courts in determining whether a law is substantive or procedural, 'the Supreme Court developed a two-part test in <u>Hanna</u>.'  <u>Royalty Network, Inc. v. Harris</u>, 756 F.3d 1351, 1357 (11th Cir. 2014) (quotation and citation omitted). Where a federal law sought to be applied is a Federal Rule of Civil Procedure, 'the district court must first decide whether the [rule] is sufficiently broad to control the issue before the court.'  <u>Royalty Network, Inc.</u>, 756 F.3d at 1358 (quotation and citation omitted). 'If the federal procedural rule is sufficiently broad to control the issue and conflicts with the state law, the federal procedural rule applies instead of the state law.'  <u>Id.</u>

> In this case, the state law, Section 774.205, requires that a plaintiff alleging asbestos exposure include with his complaint, among other things, 'a written report and supporting test results constituting prima facie evidence of the exposed person's asbestos-related . . physical impairment meeting the requirements of s. 774.204(2), (3), (5), or (6).'  Fla. Stat. § 774.205(2).  Federal Rule of Civil Procedure 8, on the other hand, only requires a complaint to include 'a short and plain statement of the claim showing that the pleader is entitled to relief[.]' If this Court required Plaintiffs to meet Section 774.205's dictates, it would require a heightened pleading requirement not contemplated by the Federal Rules of Civil Procedure. Such an approach has already been considered and rejected by the Eleventh Circuit relating to punitive damages.  <u>Cohen v. Office Depot, Inc.</u>, 184 F.3d 1292, 1298 (11th Cir. 1999) ("A state law may conflict with a Federal Rule even where it violates no affirmative command or requirement of the rule, if the Federal Rule 'occupies the statute's field of operation.'") (quoting <u>Hanna</u>, 380 U.S. at 470). The Court in <u>Cohen</u> held that a conflict exists between Federal Rule of Civil Procedure 8, which allows a plaintiff to include in a complaint a request for all the relief sought and a state law that requires leave of the court before a request of punitive damages can be made.  <u>Id.</u>  Because the court in <u>Cohen</u> found that pleading rules such as Federal Rule of Civil Procedure Rule 8 'relate[ ] to the practice and procedure' of federal courts, the Court held that Rule 8 controlled and the state law did not apply.  <u>Id.</u> at 1299 (quotation and citation omitted)
> 　　　　　　　　　　　. . .

> Federal Rule of Civil Procedure 8 allows a plaintiff's short and plain statement of the facts which establish the plaintiff's right to relief to suffice. Florida's heightened pleading requirement in asbestos cases prohibits what federal

26

procedural law allows, which creates a conflict between Florida's Section 774.205 and Federal Rule of Civil Procedure 8.   Because Florida's pleading requirement in asbestos cases conflicts with established federal procedural law, Florida's heightened standard must yield.

Dugas v. 3M Co., 101 F. Supp. 3d 1246, 1249-51 (M.D. Fla. 2015).

Here, the Court is persuaded by the district courts' reasoning in both Cohen and Dugas.  The requirement of Federal Rule of Civil Procedure 8 permitting a short and plain statement of the facts to establish a plaintiff's right to sue conflicts with the heightened pleading requirement of the Florida Asbestos Act.  Such a conflict with federal procedural law necessitates that federal law takes priority over the Florida Asbestos Act under the United States Supreme Court's decision in Hanna v. Plumer.  And in the Third Amended Complaint, Plaintiff set forth sufficient facts to proceed in the instant case under Federal Rule of Civil Procedure 8.  (Doc. No. 199.)  In any event, Defendant's argument concerning the threshold pleading requirements under the Florida law is more suited for a Motion to Dismiss argument.  Here, the Court is evaluating the action at the motion for summary judgment stage.  As a result, Defendant NGC's argument is unavailing.

### 2.   Defendant Raytheon Technologies Corporation

Defendant RTC argues that summary judgment is appropriate because Plaintiff has not produced sufficient evidence that Decedent worked with Defendant's engine components containing asbestos.  (See Doc. No. 345-2 at 16.)  In this regard, Defendant RTC contends that no reasonable jury could find that Decedent inhaled asbestos released from Defendant's products making it a substantial contributing factor in Decedent's lung cancer.  (See id.)  In particular, Defendant RTC notes that of the four former Naval officers who were deposed in the case,

only [one witness] testified to seeing Decedent work around [Defendant's] engine. The work [the witness] described involved QEC components, which were not apart of the TF30 engine and were not supplied by [Defendant].

27

(Id.)

In response, Plaintiff asserts that there is sufficient evidence regarding exposure to asbestos-containing products to survive Defendant RTC's Motion for Summary Judgment.  In support of this assertion, Plaintiff points to direct testimony from multiple witnesses, including Decedent's coworkers during his service in the Navy, concerning "what mechanics holding [Decedent's] rank did on each engine, . . . documents showing how many years [h]e spent at each location doing the same job, and . . . documents confirming the testimony of [testifying witnesses] about what engine mechanics such as [Decedent] did."  (Doc. No. 364 at 9.)

In particular, Plaintiff submits that the deposition testimony of Harold Rhodes supports the existence of a genuine dispute of material fact to survive summary judgment.  Harold Rhodes ("Rhodes"), a former co-worker of Decedent during his service on the USS Kitty Hawk and USS Saratoga, testified regarding the nature of the work he and Decedent carried out as follows:

> Rhodes:  [W]e removed the engines.  That was probably the biggest job we did. We would remove them from the airframe and then work on the engines to a certain point.  And we did certain checks along the way . . .
>
> Q:  What type of aircraft were assigned to VA-105 while you were on the Kitty Hawk?
>
> Rhodes:  A-7A

(Doc. No. 364-2 at 9.)  In addition, Rhodes testified regarding the nature of the engines removed and the frequency of his work with Decedent on these engines:

> Q:  Are you able to tell me how many times you worked with Dewy Rhoades during your time on the Kitty Hawk?
>
> * * *
>
> Rhodes:  I'd say it was—it was several times a week.

28

* * *

| | |
|---|---|
| Q: | What were your work hours on the Kitty Hawk? |
| Rhodes: | We worked 12-hour shifts. |

* * *

| | |
|---|---|
| Q: | Do you remember the manufacturer of the engines that you were removing from the A-7A's? |
| Rhodes: | Uh-huh. Yes, sir. |
| Q: | What was it? |
| Rhodes: | Pratt & Whitney. |
| Q: | Do you remember the model? |
| Rhodes: | Hmm. I had that one and its gotten away from me. |
| Q: | Okay. When you—you talked about breaking down the engine to a certain point. Can you go into some more detail about what that entailed? |
| Rhodes: | That was—you—the combustion chamber area, we took the covers off of them, removed the cans out of it, and they were inspected. And then you inspected the—what the cans were attached to, that part of the engine, for cracks. That was the big thing, was making sure there were no cracks in that area, because if there were cracks, then it would have to go to another intermediate maintenance level. |

(Id. at 9-10.)  Finally, Rhodes testified that the engine located on the A-7 aircraft was a TF30. (Id. at 29.)

Here, Plaintiff has offered sufficient evidence from which a reasonable jury could conclude that Decedent was exposed to asbestos as a result of his work as an engine repair mechanic, and that it was a substantial factor in causing his lung cancer.  Plaintiff has noted that Decedent worked lengthy twelve-hour shifts several times a week removing TF-30 engines manufactured by Defendant RTC from A7-A aircraft.  (See Doc. No. 365-2 at 5-29.)  And it is undisputed that

29

such TF30 engines contained asbestos components. (See Doc. Nos. 345-2 at 8; 364 at 5) (citing Dugas v. 3M Co., No. 3:14-CV-1096-J-39JBT, 2016 WL 3946923, at *4 (M.D. Fla. July 1, 2016)).

Furthermore, a genuine dispute of material fact exists as to whether Decedent in fact worked on parts of engines which were supplied by Defendant and contained asbestos. Plaintiff asserts that Decedent worked alongside Rhodes removing TF-30 engines containing asbestos to which Decedent was exposed. (See Doc. No. 364-2 at 29; 364 at 9-10.) Alternatively, Defendant contends that the work described by Rhodes involved "QEC components, which were not part of the TF30 engine and were not supplied by [Defendant]." (Doc. No. 345-2 at 16.) Thus, a genuine dispute of material fact exists as to whether it is more likely than not that exposure to Defendant's products during Decedent's service on the USS Kitty Hawk was a substantial contributing factor in Decedent's terminal lung cancer. Accordingly, Defendant RTC's Motion for Summary Judgment (Doc. No. 345) will be denied.

### 3. Defendant General Electric Company

Defendant General Electric Company also moves for summary judgment based upon similar arguments concerning causation. (See Doc. No. 344 at 15.) Defendant argues that Plaintiff relies solely on the testimony of Leonard Mosley, "who at most worked with [Decedent] from 1973-1975 in RHAV-6 Squadron," and this testimony is insufficient to establish causation. (Id.) Further, "Mr. Mosley never actually saw [Decedent] ever drop an engine or do any other engine work." (Id.) "There is simply no admissible evidence here that [Decedent] even worked on any asbestos-containing parts of GE J-79 jet engines, that the parts released asbestos in sufficient levels to cause lung cancer," or that Decedent was exposed to asbestos from any GE product." (Id.)

To the contrary, Plaintiff points to the deposition testimony of Leonard Mosley ("Mosley"), a supervisor and co-worker of Decedent's during his work on the USS Forrestal and USS Kitty Hawk.  (See Doc. No. 365-10.)  Mosley testified that he knew Decedent personally when he was supervising him on the USS Forrestal.  (Id. at 4-5.)  Additionally, in their service, Mosley testified that he and Decedent "did all the same jobs . . . as far as disassembling the engines and removing them."  (Id.)  Mosley testified that during the time he worked with Decedent in the RVAH6, he and other engine mechanics worked on RA5C aircraft with J-79 engines manufactured by Defendant GE.  (See id. at 4, 44.)  Mosley described in detail the work that he and Decedent performed on asbestos-containing engines such as the J-79 as follows:

> Q:         Okay. You mentioned clamps.
>
> Mosley:    Yes. Have a -- have a -- have a gray material, right?
>
> Q:         Yes.
>
> Mosley:    and a tremendous amount of vibration. That's the -- the edges of the clamp was starting to start breaking down. It's like fibrous clamp.
>
> Q.         Okay.
>
> Mosley:    And you see it's at the fringe -- like a fringe on the end of clamp. Now, the clamp itself, you see where -- where the metal clamp that the -- the metal --the metal part of the clamp because you see the depression in there. And then after you get the clamp -- the --the -- the asbestos part of the -- it was asbestos material. And you could actually slide -- slide that *off*, the clamp. And sometimes you had to slide those --slide -- slide that -- you have to clamp that worn part, wor[n] part to it. You have to slide -- slide that *off* and then push that back on -- back on a new metal – metal band in order -- in order to use -- reuse the band --reutilize the clamp, the clamp. You have a clamp -- say if you had a size -- it was a size 6 or size 4 clamp and all you had was 6, you would have to take the -- cut the number 6 clamp coating covering -- take that *off* and slide it around the number 4 or number 5 clamp metal band . . .

* * *

31

Q:        When you handled—when you and [Decedent] handled . . .  this
          coating—this---this cloth material I think you described it, what
          happened? What did you see?

Mosley:   I guess that—that—the coating usually breaks down after a while
          due to . . . the vibration.

Q:        Right. And when—

Mosley:   It breaks down.

Q:        And when it breaks down, what happens?

Mosley:   It's—it's like—like fiber. You saw like—like it like it kind of fray
          around the edges. And—and you can see the rubbing on it. The
          rubbing on it is just darker where it's been rubbed, like dark area.

                          * * *

Q:        How close were you and [Decedent] to this fibrous material?

Mosley:   Well, you have it right in your hand, it's just small. The clamp is . .
          . not like huge. It's a small clamp . . . you're right there with your
          face to the clamp in other words.

Q:        All right. You—you did this job?

Mosley:   I did this job for years, yes.

Q:        What about [Decedent]? Did [he] do this job?

Mosley:   [He] did it. I did it. Other people in our unit did it.

(Id. at 40-42.) Mosley further testified that, on numerous occasions, he and Decedent worked on

"dropping engines" which entailed rolling a cart underneath an engine, jacking it down, and

rolling it back to the engine shop for repair.  (See id. at 15.)  Specifically, he testified that

Decedent was involved in removing the engines by "go[ing] up inside of . . . the engine bay . . ."

because he was a "smaller guy" able to "squeeze in between the engine and the firewall of the

aircraft."  (Id.)  Mosley and Decedent's close working relationship is further supported by a

photograph of the two of them during their service, and the cruise book which shows their service together.  (Doc. No. 365-11.)

Here, Plaintiff has offered sufficient evidence from which a reasonable jury could conclude that Decedent was exposed to asbestos during his work removing and repairing GE J-79 engines on the USS Forrestal and in the RVAH6 Squadron.  Plaintiff has offered evidence that Defendant worked for extensive periods of time in close proximity to GE J-79 engines, even crawling inside small spaces between the engine and the aircraft wall.  Plaintiff also points to deposition testimony asserting that Decedent was involved frequently in engine repair with clamps containing asbestos material.

To the contrary, Defendant argues that Mosley never actually witnessed Decedent repairing engines containing asbestos material because Mosley testified that "his job wasn't [to] babysit[]" Decedent while he worked.  (Doc. No. 365-10 at 24.)  But in viewing the facts in the light most favorable to Plaintiff, a genuine dispute of material fact exists as to whether it is more likely than not that exposure to Defendant GE's products, such as the GE J-79 engine, was a substantial contributing factor in Decedent's terminal lung cancer.  Accordingly, summary judgment is not warranted.

### C.  Genuine Disputes of Material Fact Exist on the Government Contractor Defense

Next, each Defendant argues that summary judgment is appropriate because the government contractor defense bars Plaintiff's claims.  (See Doc. Nos. 344 at 23-30; 345 at 18-24; 352 at 21-26.)  When employing the government contractor defense, a defendant must show that: "(1) the United States approved reasonably precise specifications for the product at issue; (2) the equipment conformed to those specifications; and (3) it warned the United States about the dangers in the use of the equipment that were known to it but not to the United States."  Boyle v.

United Technologies Corp., 487 U.S. 500, 512 (1988).  A defendant may establish the third prong by showing that the Government "knew as much or more than the defendant contractor about the hazards" of the product.  Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co., 883 F.2d 1210, 1216 (3d Cir. 1989).  Regarding the first and second prongs, when addressing a failure to warn claim, the defendant must show that the government "issued reasonably precise specifications covering warnings-specifications that reflect a considered judgment about the warnings at issue."  Hagen v. Benjamin Foster Co., 739 F.Supp.2d 770, 783 (E.D. Pa. 2010) (citing Holdren v. Buffalo Pumps, Inc., 614 F.Supp.2d 129, 143 (D. Mass. 2009)).

All three Defendants assert that Plaintiff's claims are barred by the government contractor defense.  First, Defendant NGC argues that "any alleged injury attributable to a product for which [Defendant NGC] may be responsible that was made pursuant to the United States' specifications, standards, and protocols, and/or any claim that its alleged predecessor had a duty to warn about the same is barred by operation of the government contractor defense."  (Doc. No. 352 at 21.)  Further, Defendant NGC asserts that "the A-7 was strictly built pursuant to a government procurement contract, designed pursuant to detailed government specifications, and subject to post-production Government review, testing, inspection, and approval."  (Id.) Likewise, Defendant RTC argues that it is also entitled to government contractor immunity for the TF30 engines designed by its predecessor, Pratt & Whitney, because the Government approved the specifications for the engines, the engines conformed to such specifications, and the military had knowledge at the time about asbestos dust hazards.  (See Doc. No. 345-2 at 18-24.)  Finally, Defendant GE argues similarly that the government contractor defense bars Plaintiff's claims because "J79 engines were built pursuant to a government procurement contract."  (Doc. No. 344 at 26.)

In opposition, Plaintiffs argue that Defendants should not prevail at summary judgment because genuine disputes of material fact exist regarding the application of the government contractor defense. (See Doc. Nos. 363 at 23; 364 at 17; 365 at 17.) In particular, Plaintiff relies on Dugas and Willis v. BW/IP, 811 F. Supp.2d 1146 (E.D. Pa. 2011), noting that Defendants knew of the asbestos hazards and provided no warning despite government direction to do so. (See Doc. No. 364 at 17-18.) Plaintiff also asserts that the government did not require the use of asbestos in its specifications. Specifically, Plaintiff avers that "while asbestos may have been the product of choice for clamps and gaskets, there is nothing in MIL-E-5007[10] . . . about asbestos blankets or straps. . . . [Defendants] chose to use asbestos on its own and the government did not object." (Doc. No. 365 at 9-10.) Finally, Plaintiff argues that "[Defendant's Predecessor] Pratt [& Whitney], not the Government, required asbestos and a review of the relevant specification confirms this point. So there was no government requirement for asbestos." (Doc. No. 363 at 25.) To determine whether Defendants have shown that the test for government contractor immunity is established, each prong under Boyle will be discussed in turn.

### 1. First Prong of the Boyle Test

The first prong of the test in Boyle requires the Court to consider whether the Navy approved reasonably precise specifications for Defendants' products. Boyle, 487 U.S. at 512. A specification is reasonably precise "as long as the specifications address, in reasonable detail, the product design feature, alleged to be defective." Kerstetter v. Pacific Scientific Co., 210 F.3d 431, 438 (5th Cir. 2000). "The requirement that the specifications be precise means that the discretion over significant details and all critical design choices will be exercised by the government." Id. Importantly, "the requirement of reasonably precise specifications must be

---

[10] MIL-E-5007 is a government manual on specifications for engines in military aircraft. (See Doc. Nos. 345-11, 345-10.)

met by the specific feature at issue in the claim." In re Katrina Canal Breaches Litig., 620 F.3d

455, 461 (5th Cir. 2010).   The specific features at issue here are the presence of asbestos

components in aircraft engines manufactured by Defendants, such as the TF-30 and J-79.

In this regard, Defendants have submitted evidence, including drawings and diagrams, as

well as declarations, that the Navy approved specifications for aircraft engines containing

asbestos.  (See Doc. Nos. 344-8; 344-9; 345-9, 345-10; 352-11.)  All three Defendants argue that

the government thoroughly reviewed the designs of the aircraft engines, such as the TF-30 and J-

79, and approved such designs containing asbestos components in clamps and gaskets.   For

example, Defendant RTC relies on the Declaration of John C. Sumner, an engineer well versed in

Pratt & Whitney engines, who asserts that "[m]ilitary contracts required Pratt & Whitney to

submit detailed engine drawings, schematics, model specifications, and engineering data to the

military for review and approval before production could begin."   (Doc. No. 345-9 at 10.)

Likewise, Defendant GE relies on the Declaration of Charles M. Criss, a former GE employee

and aerospace engineer, who notes that, "[t]hroughout the procurement, design, testing,

inspection, and acceptance of the J79, the Government monitored, reviewed and maintained

ultimate control over the design of and specifications for the engine." (Doc. No. 344-8 at 5.)

But in regard to the first prong of the Boyle test, Defendants NGC, RTC, and GE are not

entitled to claim government contractor immunity because Plaintiff has raised genuine disputes

of material fact as to whether the government approved reasonably precise specifications for the

use of asbestos components in Defendants' engines, such as the TF-30 and J-79.  For example,

Plaintiff argues that the government did not expressly approve specifications for the use of

asbestos products in its engines, but rather rubber-stamped, or acquiesced, to such specifications.

(See Doc. No. 365 at 9.)  For example, under the "Materials, Processes, and Fasteners" section of

MIL-E-5007, a Manual on Military Specification for Engines, Plaintiff argues that the following section calls into question whether the government or Defendants approved the use of asbestos:

<u>Materials, Processes, and Fasteners</u>

3.3.1.1 <u>Materials and Processes</u>.  When the engine manufacturer's documents are used for materials and processes, such documents shall be subject to review by using service prior to the start of PFRT, and unless specifically disapproved, will be considered released upon approval of the PFRT and QT . . .

(Doc. Nos. 345-11 at 26-27; 345-10 at 9.)  Plaintiff asserts that such language shows that "the manufacture w[ould] submit its proposal for use of materials and the government can disapprove if it wanted to disapprove."  (Doc. No. 365 at 9.)  Defendants maintain that as contractors, they were barred from the use of non-asbestos in engines, but Plaintiff asserts that the government was effectively providing a rubber stamp, or a lack of disapproval, for the asbestos-containing components.  (<u>See</u> <u>id.</u>)  Such a "rubber-stamp" is not a form of government approval under <u>Boyle</u>.  <u>See</u> <u>Trevino v. General Dynamics Corp.</u>, 865 F.2d 1474, 1480 (5th Cir. 1989).

In addition, Plaintiff argues that nothing in Defendants' proffered evidence discusses the use of asbestos in blankets or straps, component parts at issue in the instant action.  Therefore, a genuine dispute of material fact remains as to whether the government merely provided a "rubber stamp" for the decision to use asbestos products in the TF-30 and J-79 engines, or if such a specification was in fact approved by the government under <u>Boyle</u>.  Accordingly, because there are genuine issues of material fact as to whether the Navy did not specify that asbestos components would be used in its engines, Plaintiff's claims are not barred by government contractor immunity at the summary judgment stage.[11]

---

[11] Because there is a genuine dispute of material fact regarding the first element of the <u>Boyle</u> test defeating summary judgment, there is no need to discuss the other two prongs of the test.

### D.  Derivative Sovereign Immunity Defense

Two Defendants (RTC and NGC) argue that Plaintiff's claims are precluded because of derivative sovereign immunity.  (See Doc. Nos. 345 at 24-25; 352 at 29-31.)  Under the doctrine of derivative sovereign immunity, government contractors cannot be sued if: "(1) the government authorized the contractor's actions and (2) the government validly conferred that authorization, meaning it acted within its constitutional power."  Bodor v. Maximus Fed. Servs., Inc., No. 5:19-CV-05787-JMG, 2021 WL 4941503, at *7 (E.D. Pa. Oct. 22, 2021) (quoting 15A Moore's Federal Practice-Civil § 105.21 (2021).

However, the doctrine of derivative sovereign immunity is not absolute.  As the United States Supreme Court noted in Brady v. Roosevelt S.S. Co., "the liability of an agent for his own negligence has long been embedded in the law."  317 U.S. 575, 580 (1943).  Therefore, "the doctrine of derivative sovereign immunity is not a viable defense to government contractors whose own negligence caused the harm."  Bodor v. Maximus Fed. Servs., Inc., No. 5:19-CV-05787-JMG, 2021 WL 4941503, at *7 (E.D. Pa. Oct. 22, 2021) (citing Hilbert v. Aeroquip, Inc., 486 F. Supp. 2d 135, 148 (D. Mass. 2007) (holding that government contracts are not protected by derivative sovereign immunity when "the harm was caused by the private party's own tortious conduct").  Thus, because summary judgment is not being granted on Plaintiff's negligence claim, and there is a genuine dispute of material fact on whether the government authorized the Defendant's use of asbestos in the products—the engines—it ordered, the Court will not grant summary judgment based upon derivative sovereign immunity.  See Bodor, at *7.  Simply put, questions of fact are still at issue.

### E.  Conspiracy and Punitive Damages Claims

Finally, Defendant NGC also moves for partial summary judgment on Plaintiff's (1) conspiracy to hide the hazards of asbestos pursuant to negligence and (2) punitive damages claims.  (Doc. No. 352 at 31-33.)  Because the court is not granting summary judgment on Plaintiff's negligence claims for the reasons discussed <u>supra</u>, summary judgment on the claim of conspiracy pursuant to negligence will be denied for the same reasons.  Moreover, consideration of the claim for punitive damages is premature at this time.  A decision on whether to allow a claim for punitive damages depends on the evidence presented at trial.

## V.   CONCLUSION

For the foregoing reasons, Defendant General Electric Company's Motion for Summary Judgment (Doc. No. 344), Defendant Raytheon Technologies Corporation's Motion for Summary Judgment (Doc. No. 345), and Defendant Northrop Grumman Corporation's Motion for Summary Judgment (Doc. No. 352) will be denied.  The claims that remain in this case against Defendants RTC, NGC, and GE to be tried are as follows:

1. Negligence (Count I)

2. Strict Liability (Count II)

3. Conspiracy to Hide the Hazards of Asbestos Pursuant to Negligence and Punitive Damages Claims (Count III)

4. Breach of Warranty (Count IV)

(Doc. No. 199.)  An appropriate Order follows.